IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.

MORGAN MARINE SERVICE, LLC,
a Rhode Island limited liability company,

      Plaintiff,

vs.

ALL CRAFT MARINE, LLC d/b/a CENTURY
BOATS, a Florida limited liability company, and
ANCHORS AWEIGH CAPITAL, LLC,
a Texas limited liability company,

      Defendants.

_____/

## COMPLAINT

Plaintiff, MORGAN MARINE SERVICE, LLC sues ALL CRAFT MARINE, LLC d/b/a

CENTURY BOATS and ANCHORS AWEIGH CAPITAL, LLC and states:

### JURISDICTION, VENUE AND THE PARTIES

1.     This is an action for damages in excess of $75,000 in damages, exclusive of interest,

costs and attorney's fees.

2.     Subject matter jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C.

§1332.

3.     Morgan Marine Service, LLC ("Morgan") is a Rhode Island limited liability

company. Morgan Marine's sole member is Morgan Huntley ("Huntley"), who is domiciled in

Newport, Rhode Island. Therefore, Morgan Marine is a citizen of Rhode Island for jurisdictional

purposes.

4.      All Craft Marine, LLC d/b/a Century Boats ("Century") is a Florida limited liability company.  Upon information and belief, Century's sole members are Lloyd Sorenson, who is domiciled Pasco County, Florida and John Lucius, who is also domiciled in Pasco County, Florida. Century's principal place of business is located in Pasco County, Florida, Therefore, Century is a citizen of the state of Florida for jurisdictional purposes.

5.      Anchors Aweigh Capital, LLC ("AAC") is a Texas limited liability company. Upon information and belief, AAC's principal place of business is in Broward County, Florida.  Upon information and belief, AAC's sole member is Lloyd Sorenson, who is domiciled in Pasco County, Florida.  Therefore, AAC is a citizen of Florida for jurisdictional purposes.

6.      Venue is proper in this judicial district under 28 U.S.C. §1391(a) because it is the district in which the conduct complained of arose.

7.      Morgan Marine has retained the services of the undersigned law firm and has agreed to pay the firm reasonable attorneys' fees and costs in connection with this matter.

## MATERIAL ALLEGATIONS

8.      Morgan Marine was founded by Huntley. Until the acquisition of its assets in March 2020, Morgan Marine was a builder of premium recreational custom boats under the brand name "Vanquish." Morgan Marine offered a line of seven different models including the 21' center console, 23' center console, 23' cuddy cabin, 24' runabout, 24' center console, 26' runabout, 26' center console and  26' dual console.

9.      In December 2018, Morgan Marine engaged AAC to provide "advisory services" as its exclusive advisor to represent Morgan Marine in the sale of its assets, which including the tooling, or molds, for the continued manufacture of the boats.

10.     Morgan Marine and AAC entered into an "Engagement Agreement." The scope of services to be provided by AAC included, among other things, AAC advising Morgan Marine in

#85077080_v1

identifying a buyer, negotiating the terms of a sale, management of the financing of such a transaction and develop a due diligence plan. Morgan Marine relied on AAC to provide the due diligence and appropriately advise Morgan Marine. For its services, AAC was to be paid a success fee.

11.     AAC identified Century as a suitable buyer of the assets of Morgan Marine.

12.     On March 23, 2020, Morgan Marine entered into an Asset Purchase Agreement ("APA"), a true and correct copy of which is attached hereto as **Exhibit A**.

13.     Pursuant to the APA, Century agreed to pay Morgan Marine, as Seller,[1] $116,075.00 (the "Seller Funds"), 3.5% of the stock of Century, and an Earnout of $3,820.00 per Qualified Boat for each boat sold before March 23, 2023 (collectively the Purchase Price).

14.     Prior to the Closing, Century was acquired by an investment firm known as Sofram Capital.[2]  Sorenson, who is the principal of AAC, is also the principal of Sofram Capital, became the CEO of Century.

15.     In a public statement announcing the acquisition of Morgan Marine's assets, Sorenson stated "[Morgan Marine] is known for producing stunning designs in the New England tradition, rooted in timeless quality and craftsmanship.  This merger represents a natural expansion of our portfolio which will be mutually beneficial across our line of fishing and family boats."[3]

16.     Pursuant to the APA, Huntley became the chief operating officer of Century and led product development for the company.

17.     While Century paid $31,000.00 of the Seller Funds at Closing, it has not paid the Remaining Funds in the amount of $85,075.00 as required by Section 4 of the APA.

---

[1] All capitalized terms have the same meaning as set forth in the Asset Purchase Agreement.

[2] https://boattest.com/article/century-acquires-vanquish-boats

[3] *Id.*

#85077080_v1

18.    Section 4.1 provided that the Remaining Funds of the Purchase Price will be

provided at the occurrence of the following events, pending whichever one materializes first:

> 4.1.1   Buyer will provide the remaining funds within three days of successful
> closing of the Greater Commercial Lending Term Debt and Revolving Debt
> refinancing.
>
> 4.1.2   Buyer will provide the remaining funds within three days of the selling of
> the "Northpoint Repossessed" 24' Resorter and/or Center Console.
>
> 4.1.3   Seller will provide clear "Bill of Sale" for Seller's molds and tools upon
> final cash payment of the Remaining Funds...

19.    The sale of the repossessed boat has occurred.  Therefore, Section 4.1.2 has been

satisfied and the Remaining Funds are due now.

20.    Upon information and belief, the refinancing to be provided by Greater Commercial

Lending has also occurred, which means that Section 4.1.1 has been satisfied.

21.    In addition, Century has failed to pay any of the Earnout, which Morgan Marine

estimates will be $136,000.00 by March 23, 2023.

22.    Huntley was not aware of the poor financial condition of Century until after he

entered the APA and became an employee of Century.  As it turns out, Century was in such poor

financial condition that Sorenson claimed to be unable to pay any of the Remaining Funds or any

Earnout until after Century refinanced the debt owed to Greater Commercial Lending.

23.    In October 2020, Huntley resigned from Century.  Century presented Huntley with

a Separation Agreement in October 2020 in which it attempted, in contravention of the APA, to

make the payment of the Remaining Funds and the Earnout entirely contingent on the refinancing

of Century's debt.  Huntley understandably rejected this proposal.

24.    Huntley would not have entered into the APA had he known that he would be forced

to wait for over a year for the Remaining Funds and would not have received any of the Earnout.

4

25.     It was not clear at the time of the Engagement Agreement with AAC that Sorenson would essentially be wearing two hats, one as the broker and one as the representative of the Buyer, Century.

26.     AAC was obliged to perform the due diligence and advise Huntley appropriately as to whether Century was a suitable buyer

### COUNT I—BREACH OF CONTRACT

27.     Morgan Marine  restates here the allegations in paragraphs 1 through 26.

28.     This is action by Morgan Marine against Century for breach of contract, specifically the APA.

29.     Morgan Marine and Century entered into the APA.

30.     Morgan Marine timely delivered its assets, including the tooling, to Century.

31.     Century breached the APA when it failed to pay the Remaining Funds due to Morgan Marine and any of the Earnout.

32.     Morgan Marine has suffered damages as a result of Century's breach of the APA.

**WHEREFORE,** Plaintiff, Morgan Marine, respectfully requests that the Court enter a Final Judgment in its favor for damages against Century for Century's breach of the APA in a principal amount greater than $75,000, pre and post judgment interests, costs and such other and further relief as the Court deems just and proper.

### COUNT II-NEGLIGENT MISREPRESENTATION

33.     Morgan Marine restates here the allegations in paragraphs 1 through 26.

34.     AAC was engaged by Morgan Marine to identifying a buyer of its assets, negotiating the terms of a sale, management of the financing of such a transaction and develop a due diligence plan.

35.     AAC represented a material fact to Morgan Marine, namely that Century was a suitable buyer that had the financial stability to be a suitable buyer of the assets of Morgan Marine.

36.     At the time that AAC made this representation, AAC knew or should have known the true poor financial condition of Century because AAC's principal, Sorenson, was also the principal of Sofram Capital, the entity that acquired Century days before the Closing of the APA.

37.     AAC made the material representations about Century's suitability as a purchaser of the assets of Morgan Marine with the intention that Morgan Marine rely on these representations and AAC's purported due diligence.

38.     AAC's motivation for inducing such reliance was twofold.   First, it wanted to collect its success fee.  Second, its principal, Sorenson, wanted to acquire the assets of a company "known for producing stunning designs in the New England tradition, rooted in timeless quality and craftsmanship."

39.     Morgan Marine in fact justifiably relied on the material representations by AAC, who it entrusted to perform due diligence to find a suitable buyer.

40.     Huntley, the principal of Morgan Marine, only discovered the true condition of Century after he arrived as Century's chief operating officer.

41.     Had Huntley or Morgan Marine known of Century's poor financial condition, it would not have entered into the APA.

42.     As a result of the negligent misrepresentations of AAC, Morgan Marine has suffered damages, including but not limited to the $80,000.00 that Morgan Marine paid to AAC as a "success fee" and damages incurred by Morgan Marine in going forward with the APA with Century.

WHEREFORE, Morgan Marine respectfully requests that the Court enter a Final Judgment in its favor for damages against AAC for AAC's negligent misrepresentations in a principal amount greater than $75,000, pre and post judgment interests, costs and such other and further relief as the Court deems just and proper.

Date:   June 30, 2021

/s *David E. Cannella*
David E. Cannella
Florida Bar No. 983837
Holland & Knight LLP
200 South Orange Avenue, Suite 2600
Orlando, Florida 32801
(p) 407-244-5127; (f) 407-244-5288
Primary E-mail: david.cannella@hklaw.com
Secondary E-mail: kelly.wilson@hklaw.com
*Counsel for Morgan Marine Services, LLC.*

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into this 23 day of March, 2020, by and among Morgan Marine Service, LLC, a limited liability company duly organized and existing under the laws of the State of Rhode Island, with a principal place of business located at One Washington Street, Newport, Rhode Island 02840 ("Seller"), and All Craft Marine LLC, a limited liability company duly organized and existing under the laws of Florida or their nominee or assigned("Buyer").

## WITNESSETH

WHEREAS, the Buyer desires to purchase, and the Seller desires to sell substantially all the assets used or useful, or intended to be used, in the operation of the Seller's business, as they are more particularly set forth herein;

NOW THEREFORE, in consideration of the promises and the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Buyer do hereby agree as follows:

*SEE SCHEDULE "C" ATTACHED*                    LMS/

Section 1. Assets Purchased. The Seller agrees to sell to the Buyer and the Buyer agrees to purchase from the Seller, on the terms and conditions set forth in this Agreement, the tangible and intangible assets owned or used by the Seller in connection with its business (collectively, the "Assets"), regardless of nature or type with the only exceptions for those assets specifically excluded below. The Assets shall, free of any liabilities and encumbrances arising in connection with the operation of the business by the Seller prior to the closing, except for those royalty payments required under that certain contract attached as Exhibit "B", which obligation shall pass to Buyer. The provisions of this paragraph shall survive the closing.

Section 2. Excluded Assets. Specifically excluded from this sale and purchase are all assets listed on Exhibit "A". For purposes of clarification and not limitation or extension, Buyer recognizes that Seller has disposed of Seller's trademarks, corresponding intellectual property, as well as a domain name related to the business of Seller. As such, Buyer neither expects nor requests Seller to transfer these items.

Section 3. Liabilities Assumed. With the exception of those certain royalty payments due under the contract attached as Exhibit "B," the Buyer shall not assume, agree to pay, discharge, perform, or incur, any liabilities or obligations of the Seller, as the case may be. Further, while taking or assuming no liabilities related to that certain agreement known to the Parties as the "Sea Force IX contract", Seller will be responsible for any potential liability arising from or related to said contract and Buyer will assume no liability or obligations of the contract prior to or after closing of this agreement.

Section 4. Purchase Price. In consideration for the sale, conveyance, transfer, and delivery of the Assets and the Assigned Contracts and upon the terms and subject to the conditions set forth in this Agreement, Purchaser shall pay to Seller:

4.1.    One Hundred Sixteen Thousand and Seventy-Five Dollars ($116,075.00), (the "Seller Funds"), of which Thirty-One Thousand Dollars ($31,000.00) will be provided at

- 1 -

closing, the remaining (the "Remaining Funds") amount of Eighty-Five Thousand Seventy-Five Dollars ($85,075.00) to be provided as determined by the following events, pending whichever one materializes first:

    4.1.1   Buyer will provide remaining funds within three days of successful closing of the Greater Commercial Lending Term Debt and Revolving Debt refinancing.

    4.1.2   Buyer will provide remaining funds within three days of selling the "Northpoint Repossessed" 24' Resorter and/or 22' Center Console.

    4.1.3   Seller will provide clear "Bill of Sale" for Seller's molds and tools upon final cash payment of the Remaining Funds. Seller shall, at Closing, deliver all other Assets to Purchaser and such instruments contemplated by this Agreement, including such other bills of sale, endorsements, assignments, deeds, drafts, checks, stock powers, or other instruments as shall be effective to provide Purchaser good and marketable title to the Assets subject to no liens, encumbrances, or rights in any other party whatsoever, except as are described in the Disclosure Schedule.

    4.2    Three and One-half (3.5%) percent of the Purchaser's (or whatever entity the Purchaser selects or creates to conduct the Business using the Assets) interest immediately following the Closing (subject to the Seller, or its assign, agreeing to and signing the relevant organizational or corporate documents, including, but not limited to, any operating or shareholders' agreement, et. al.) (the "Seller Equity"); and

    4.3    After the Closing Date, Purchaser will pay Seller, or its assign, an additional amount of $3,820.00 per – Qualified Boat (as that term is defined below) sold for the thirty-six (36) months following the Closing Date and ending on the third (3rd) anniversary of Closing Date (the "Earnout") (the Seller Funds, Seller Equity and Earnout are collectively the Purchase Price).

    For purposes of this Agreement, a "Qualified Boat" shall be any boat built from a mold acquired by the Buyer pursuant to this Agreement (sometimes being referred to by the Parties as the Vanquish or Bristol Harbor Boats.

    Section 5.  Closing. The closing of the sale and purchase (the "Closing") shall take place at the offices of Escrow Agent on March 23, 2020. At the Closing, Purchaser shall deliver to Sellers' Representative an amount equal to the Seller Funds and Seller shall deliver to Purchaser such instruments contemplated by this Agreement and such other bills of sale, endorsements, assignments, deeds, drafts, checks, stock powers, or other instruments as shall be effective to vest in Purchaser good and marketable title to the Assets subject to no liens, encumbrances, or rights in any other party whatsoever, except as are described in the Disclosure Schedule.

---

**Section 6.** Employment of Morgan Huntley.   Following Closing, Morgan Huntley ("Huntley" or "Principal") shall provide services (the Post Closing Services as that term is described below) in exchange for:

6.1    Eighty-Eight Thousand ($88,000.00) Dollars in annual salary ("Post-Closing Salary") paid per Purchaser's customary payroll practices, provided that Purchaser must pay Huntley no less often than twice a month; and

6.2    An annual bonus of up to twenty-five (25) percent of Post-Closing Salary at the discretion of the Purchaser's CEO and Board of Managers (or equivalents thereof); and

6.3.    Participation in any equity incentive plan for individuals in the same class as Huntley wherein Huntley may receive an additional one (1) to two (2) percent interest in Purchaser in the form of restricted units vesting in equal amounts every year over a four (4) year period; and

6.4.    In the event that Purchaser terminates this services agreement with Huntley without cause, severance payments totaling fifty (50) percent of Post-Closing Salary payable over a six (6) month period following the aforementioned termination, as described in and governed by employment agreement attached hereto as Exhibit "C"; and

6.5.    Such other benefits, such as time-off, health and other such benefits, as set forth in a separate employment agreement between Purchaser and Huntley.

"Post-Closing Services" shall include responsibility for manufacturing and product development, including operations, mold and tool maintenance, inventory, safety, facilities and labor workforce, contract manufacturing with other brands and all other duties of similarly situated and titled individuals in the Purchaser's industry, as such industry is defined based the Purchaser's activities after Closing.

### Section 7.  Confidentiality And Noncompetition.

7.1    Confidentiality.  Seller and each Principal each agree, as an inducement to the performance by Purchaser of its obligations under this Agreement and in consideration of the Purchase Price, that none of Seller or any of the Principals shall use, permit the use of, disclose, or permit the disclosure to any competitor or other third party of any Confidential Information (as herein defined). Seller and each of the Principals acknowledge that the continued success of Purchaser is highly dependent upon maintaining the confidentiality of such information and preventing its disclosure to competitors and other third parties.  "Confidential Information" includes, but shall not be limited to, information pertaining to research and development of new product designs, sales and marketing information of Purchaser, trade secrets, software programs, and customer data and shall include any information of a similar nature hereafter identified to this Agreement as confidential or proprietary.  "Customer data" means any information pertaining to a customer, distributor, supplier, or other person or entity contacted to utilize Purchaser's services or purchase or license its products, including, but not limited to, preferences, pricing information, service needs, software, and similar insider knowledge of such parties' requirements obtained by Purchaser at any time or obtained by Seller or any Principal.

- 3 -

Seller and each Principal each agree that for the period twenty-four (24) months following the Closing Date (the "Restricted Period"), neither Seller nor any Principal will disclose to any unauthorized person or use for its own account, any of such Confidential Information, unless and to the extent the aforementioned matters become known to or available for use by the public otherwise than as a result of Seller's or such Principal's acts or omissions to act. Seller and Principals each further agree that after the Closing Date, he will not withhold or retain any records, papers, letters, or other data and information with respect to the Assets or Confidential Information.

7.2    Noncompetition and Nonsolicitation.

At all times during the Restricted Period, Seller and each Principal (as to himself or itself) agree that, it or he will not directly or indirectly, individually or jointly with others, whether for it or his own account or the account of any other person or entity solicit, divert, attempt to take away or interfere with any customer, client, or distributor of Purchaser, or cause any of them to reduce the extent of, or otherwise adversely affect such entity's business relationship with Purchaser, nor own, manage, operate, control, be employed by, participate in, assist others in, have an interest in, or otherwise engage in, or permit it or his name to be used by or in connection with, in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, any business engaged in the Business or that otherwise competes with Purchaser in the Business or in the business of powerboat and yacht product design, manufacturing and sale within the Restricted Territory; provided, however, that the record or beneficial ownership by any Principal of one percent (1%) or less of the outstanding publicly traded capital stock of any company for investment purposes shall not be deemed to be in violation of this Section so long as the Principal is not an officer, director, employee or consultant of such Person. Seller and each Principal (as to himself) further covenants that it or he will not solicit, hire or employ, in any capacity, any employee or independent contractor of Purchaser or former employee or contractor who had been employed by or engaged as an independent contractor Purchaser or Seller within the twelve (12) months preceding the date of such solicitation or other action; provided, however, that in the event that Purchaser relocates the Business and solely as a result thereof, any employee or contractor of the Purchaser terminates his employment with Purchaser, Purchaser will not unreasonably withhold its consent to such employee's or contractor's request to work for an Affiliate of the Principals.

For purposes of this Agreement, the "Restricted Territory" means within any market in the United States of America.

Noninterference.  At all times during the Restricted Period, Seller and each Principal (as to himself) agrees that, it or he will not directly or indirectly, (i) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Closing Date) between the Seller and/or Purchaser and customers or suppliers of Seller and/or Purchaser or (ii) to refrain from all conduct, verbal or otherwise, that disparages or damages or is intended to damage the reputation, goodwill, or standing in the community of the Purchaser.

Section 8..  Broker's Fee(s).  Except for the broker's fee payable by Seller to Anchors Aweigh Capital, no broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of

- 4 -

Seller, except for Anchors Aweigh Capital, whose fee shall be the sole responsibility of Seller.

### Section 9.  Closing Obligations.

9.1    Obligations of Seller at the Closing.  At the Closing, the Seller shall execute such documents as may be necessary to effectuate the transaction or as the Buyer or Buyer' lender may reasonably request, and deliver to the Buyer the following:

    9.1.1    One or more bills of sale from the Seller conveying all of the Assets to the Buyer and an assignment of all contracts with clients;

    9.1.2    A vote or consent of the corporation authorizing the execution, delivery and performance of this Agreement, and any other agreement to be entered into by the Seller in connection herewith, and the transactions contemplated hereby;

    9.1.3    All necessary consents of third parties to be assigned to and/or assumed by the Buyer hereunder;

    9.1.4    A Certificate of Good Standing from the Rhode Island Secretary of State;

    9.1.5    Such other assignments, bills of sale, instruments of conveyance, certificates of officers and other documents as reasonably may be requested by the Buyer prior to the Closing to consummate this Agreement and the transactions contemplated hereby.

9.2.    Obligations of Buyer at the Closing.  At the Closing, the Buyer shall execute, or cause to be executed such documents as may be necessary to effectuate the transaction, and shall deliver to the Seller documents as reasonably may be requested by the Seller prior to the Closing to consummate this Agreement and the transactions contemplated hereby.

### Section 10.  Seller Obligation Prior to Closing.

10.1    Seller's Operation of Business Prior to Closing.  The Seller agrees that between the date of this Agreement and the Closing Date, the Seller will:

    10.1.1    Continue to operate the business that is the subject of this Agreement in the usual and ordinary course and in substantial conformity with all applicable laws, ordinances, regulations, rules or orders, and will use its best efforts to preserve its business organization and preserve the continued operation of its business with its customers, suppliers and others having business relations with the Seller.

    10.1.2    Not assign, sell, lease or otherwise transfer or dispose of any of the assets used in the performance of its business, whether now owned or hereafter acquired, except in the normal and ordinary course of business and in connection with its normal operation.

- 5 -

10.1.3  Maintain all of its Assets in their present condition, reasonable wear and tear and ordinary usage excepted, and maintain the inventories at levels normally maintained.

## Section 11.  Covenants of Buyer Prior to Closing.

11.1  Conditions and Best Efforts.  The Buyer will use its best efforts to effectuate the transactions contemplated by this Agreement and to fulfill all the conditions of the Buyer' obligations under this Agreement, and shall do all acts and things as may be required to carry out the Buyer' obligations and to consummate this Agreement.

11.2  Confidential Information.  If for any reason the sale of Assets is not closed, the Buyer will not disclose to third parties any confidential information received from the Seller or the Seller's Shareholder in the course of investigating, negotiating and performing the transactions contemplated by this Agreement.

Section 12.  Seller's Representations and Warranties.  The Seller represents and warrants to the Buyer as follows:

12.1  Corporate Existence.  The Seller, will, as of the closing date, be a corporation duly organized, validly existing and in good standing under the laws of the State of Rhode Island, which will have all requisite corporate power and authority to own its properties and assets and carry on its business and which will be in good standing in each jurisdiction in which such qualification is required.

12.2  Corporation Power and Authorization.  The Seller has full corporate authority to execute and deliver this Agreement and any other agreement to be executed and delivered by the Seller in connection herewith, and to carry out the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate and shareholder action.  No other corporate proceedings by the Seller will be necessary to authorize this Agreement or the carrying out of the transactions contemplated hereby.  This Agreement constitutes a valid and binding Agreement of the Seller in accordance with its terms.

12.3  Conflict with Other Agreements, Consents and Approvals.  With respect to (i) the articles of incorporation or bylaws of the Seller, (ii) any applicable law, statute, rule or regulation, (iii) any contract to which the Seller is a party or may be bound, or (iv) any judgment, order, injunction, decree or ruling of any court or governmental authority to which the Seller is a party or subject, the execution and delivery by the Seller of this Agreement and any other agreement to be executed and delivered by the Seller in connection herewith and the consummation of the transactions contemplated hereby will not, to the best of Seller's knowledge, (a) result in any violation, conflict or default, or give to others any interest or rights, including rights of termination, cancellation or acceleration, (b) require any authorization, consent, approval, exemption or other action by any court or administrative or governmental

- 6 -

body which has not been obtained, or any notice to or filing with any court or administrative or governmental body which has not been given or done, or (c) except as set forth herein, require the consent of any third party.

12.4    Compliance with Law.  To the best of Seller's knowledge, the Seller's use of the Assets, wherever located, has been in compliance with all applicable federal, state, local or other governmental laws or ordinances, the non-compliance with which, or the violation of which, might have a material adverse affect on the Assets, or the financial condition, results of operations or anticipated business prospects of the Buyer, and the Seller has received no claim or notice of violation with respect thereto.  Without in any way limiting the generality of the foregoing, to the best of Seller's knowledge, the Seller is in compliance with, and is subject to no liabilities under any and all applicable laws, governmental rules, ordinances, regulations and orders pertaining to the presence, management, release, discharge or disposal of toxic or hazardous waste material or substances, pollutants (including conventional pollutants) and contaminants.  The Seller has obtained all material permits, licenses, franchises and other authorizations necessary for the conduct of its business.

12.5    Financial Statements/Business Records.  The Seller's Financial Statements and/or Business Records are in accordance with the books and records of the Seller and are true, correct and complete; fairly present financial conditions of the Seller at the dates of such Financial Statements and/or Business Records, and the results of its operations for the periods then ended; and were prepared in accordance with generally accepted accounting principles applied on a basis consistent with prior accounting periods.  Except as described in this Agreement, there has been no material adverse change in the financial condition of the Seller. As such, Seller must attached financial statements for 2019 to this Agreement prepared by a certified public accountant in the form of a Compilation, as such is generally understood to mean in the accounting industry.

12.6    Tax and Other Returns and Reports.  (i) All federal, state, local and foreign tax returns and reports (including without limitation all income tax, social security, payroll, unemployment compensation, sales and use, excise, privilege, property, ad valorem, franchise, license and school) required to be filed by the Seller by the Closing ("Tax Returns") have been filed with the appropriate governmental agencies in all jurisdictions in which such returns and reports are required to be filed, and all such returns and reports properly reflect the taxes of the Seller for the periods covered thereby; (ii) all federal, state and local taxes, assessments, interest, penalties, deficiencies, fees and other governmental charges or impositions, including those enumerated above with respect to the Tax Returns, which are called for by the Tax Returns, or which are claimed to be due from the Seller by notice from any taxing authority, or upon or measured by its properties, assets or income ("Taxes"), have been properly accrued or paid by or at the Closing if then due and payable; (iii) a Certificate of Good Standing will be obtained from the Rhode Island Division of Taxation for the sale of the major portion of the assets.

1.2.7    Title to Assets.  The Seller holds good and marketable title to the Assets, free and clear of restrictions on or conditions to transfer or assignment, and free and clear of liens, pledges, charges or encumbrances.

1.2.8    Noncancelable Contracts.  At the time of Closing, there will be no material lease, employment contracts, contracts for services or maintenance, or other similar contracts existing or relating to or connected with the operation of the Seller's business not cancelable within thirty (30) days, except as set forth herein.

1.2.10   Litigation.  The Seller has no knowledge of any claim, litigation, proceeding or investigation pending or threatened against the Seller that might result in any material adverse change in the business or condition of Assets being conveyed under this Agreement.

Section 13. Intentionally Omitted.

Section 14.  Conditions Precedent to Buyer' Obligations.

14.1    Representations, Warranties and Covenants of Seller.  The representations and warranties of the Seller contained herein and the information contained in the Schedules and any other documents delivered by the Seller in connection with this Agreement shall be true and correct in all material respects at the Closing, and the Seller shall have performed all obligations and complied with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by it on prior to the Closing.

14.2    No Suits or Actions.  At the Closing Date no suit, action or other proceeding shall have been threatened or instituted to restrain, enjoin or otherwise prevent the consummation of this Agreement or the contemplated transactions.

Section 15.  Conditions Precedent to Obligations of the Seller.  The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or at the Closing Date, of each of the following conditions, any one or a portion of which may be waived in writing by the Seller:

15.1    Representations, Warranties and Covenants of Buyer.  All representations and warranties made in this Agreement by the Buyer shall be true as of the Closing Date as fully as though such representations and warranties had been made on and as of the Closing Date, and the Buyer shall not have violated or shall not have failed to perform in accordance with any covenant contained in this Agreement.

15.2    Buyer's Acceptance.  The Buyer represents and acknowledges that they have entered into this Agreement on the basis of their own examination, personal knowledge and opinion of the value of the business.  The Buyer have not relied on any representations made by the Seller other than those specified in this Agreement.  The Buyer further acknowledges that the Seller has not made any agreement or promise to repair or improve any of the leasehold improvements, equipment or other personal property being sold to the Buyer under this Agreement, and that the Buyer

take all such property in the condition existing on the date of this Agreement, except as otherwise provided in this Agreement.

Section 16.     Risk of Loss.    The risk of loss, damage or destruction to any of the equipment, inventory or other personal property to be conveyed to the Buyer under this Agreement shall be borne by the Seller to the time of Closing. In the event of such loss, damage or destruction, the Seller, to the extent reasonable, shall replace the lost property or repair or cause to repair the damaged property to its condition prior to the damage. If replacement, repairs or restorations are not completed prior to Closing, then the purchase price shall be adjusted by an amount agreed upon by the Buyer and the Seller that will be required to complete the replacement, repair or restoration following Closing. If the Buyer and the Seller are unable to agree, then the Buyer, at their sole option and notwithstanding any other provision of this Agreement, upon notice to the Seller, may rescind this Agreement and declare it to be of no further force and effect, in which event there shall be no Closing of this Agreement and all the terms and provisions of this Agreement shall be deemed null and void.

For purpose of clarification only and to remove doubt, Buyer is to assume or suffer any damage from or relating to the aforementioned Sea Force IX contract, with all such liability being the sole obligation of the Seller.

Section 17.     Indemnification and Survival.

17.1     Survival of Representations and Warranties.    All representations and warranties made in this Agreement shall survive the Closing of this Agreement, except that any party to whom a representation or warranty has been made in this Agreement shall be deemed to have waived any misrepresentation or breach of representation or warranty of which such party had knowledge prior to Closing. Any party learning of a misrepresentation or breach of representation or warranty under this Agreement shall immediately give written notice thereof to all other parties to this Agreement. The representations and warranties in this Agreement shall terminate three years from the Closing Date, and such representations or warranties shall thereafter be without force or effect, except any claim with respect to which notice has been given to the party to be charged prior to such expiration date.

17.2     Seller's Indemnification.

17.2.1     The Seller hereby agrees to indemnify and hold the Buyer, their successors and assigns harmless from and against:  (i) Any and all damages, losses, claims, liabilities, deficiencies and obligations of every kind and description, contingent or otherwise, arising out of or related to the operation of the Seller's business prior to the close of business on the day before the Closing Date, for purposes of clarification and not limitation in any way shape or form, Seller is agreeing to indemnify and hold Buyer harmless in any claim, action or matter involving boats made (though not necessarily sold), prior to the close of business on the day before Closing, except for damages, losses, claims, liabilities, deficiencies and obligations of the Seller expressly assumed by the Buyer under this Agreement or paid by insurance maintained by the Seller or the Buyer; (ii) any liability or obligation of the Seller which

- 9 -

is not an Assumed Liability; (iii) any and all damage or deficiency resulting from any material misrepresentation, breach of warranty or covenant, or nonfulfillment of any agreement on the part of the Seller and the Seller's Shareholder under this Agreement; (iv) any and all damages, losses, claims and liabilities related to any claim that the use of any of the assets purchased herein, violates any license or infringes upon any intellectual property rights of others; and (iv) any and all actions, suits, claims, proceedings, investigation, audits, demands, assessments, fines, judgments, costs and other expenses (including, without limitation, reasonable audit and attorneys fees) incident to any of the foregoing.

17.2.3  The Seller's indemnity obligations under Section 17.2 shall be subject to the following: (i) If any claim is asserted against the Buyer that would give rise to a claim by the Buyer against the Seller for indemnification under the provisions of this Section, then the Buyer shall promptly give written notice to the Seller's Shareholder concerning such claim and the Seller's Shareholder shall, at no expense to the Buyer, defend the claim, (ii) the Seller's indemnification obligations shall apply, without exception, to amounts of $2500 or higher stemming from the same event or series of events.(iii) The Seller's Shareholder shall not be required to indemnify the Buyer for an amount that exceeds the total purchase price paid by the Buyer under this Agreement.

17.3   Buyer' Indemnification.  The Buyer agree to defend, indemnify, and hold harmless the Seller from and against: (i) any and all claims, liabilities and obligations of every kind and description arising out of or related to the operation of the business following Closing but only to the extent that such is not the fault, whether negligence or otherwise, of Seller or arising out of the Buyer' failure to perform obligations of the Seller assumed by the Buyer pursuant to this Agreement; (ii) after the Closing, any liability or obligation of the Seller which is an Assumed Liability; (iii) any and all damage or deficiency resulting from any material misrepresentation, breach of warranty or covenant, or nonfulfillment of any agreement on the part of the Buyer under this Agreement; and (iv) any and all actions, suits, claims, proceedings, investigation, audits, demands, assessments, fines, judgments, costs and other expenses (including, without limitation, reasonable audit and attorney's fees) incident to any of the foregoing.

Section 18.   Intentionally Omitted.

Section 19.   Default.  In the event that Buyer fail to perform their obligations hereunder, the Seller shall have the option of terminating this Agreement and all deposits paid hereunder shall be retained by the Seller as liquidated damages due to the difficulty in ascertaining actual damages between Seller and Buyer.  If Seller breaches this Agreement or shall fail to perform the obligations and conditions to be performed and satisfied by it hereunder, the Deposit and all other payments to Seller under this Agreement shall be promptly returned to Buyer, Seller shall reimburse Buyer for all of their reasonable, out-of-pocket expenses incurred in connection with entering into this Agreement and conducting any due diligence investigations, and Buyer may pursue any and all remedies available to them at law or in equity, including but

- 10 -

not limited to a suit for specific performance or other equitable relief in connection with the matters arising out of this Agreement and the transactions contemplated hereby.

Section 20.    Miscellaneous Provisions

20.1.    Confidentiality.  At all times prior to and after the Closing Date, and after any termination of this Agreement, each party hereto will hold and will use their best efforts to cause their respective representatives to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, this transaction, the terms of this transaction, and any information or documentation of any kind or nature not generally available to the public regarding any other party hereto.  The parties agree that no such information or documentation shall be communicated, transferred, divulged, or appropriated for use by a party hereto, whether for such party's use or for the use of a third party, without the prior written consent of the other party.

20.2.    Additional Instruments of Transfer.  From time to time after the Closing, each party shall, if requested by another party, make, execute, acknowledge and deliver such additional assignments, and other instruments, as may be reasonably necessary or proper to carry out the specific provisions of this Agreement. Such efforts and assistance shall be at the cost of the requesting party.

20.3    Payment of Fees and Expenses.  Each party to this Agreement will be responsible for, and will pay, all of its own fees and expenses, including those for its own counsel and accountants, incurred in the negotiation, preparation and consumption of this Agreement and this purchase and sale.

20.4.    Amendments and Waivers.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

20.5.    Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

20.6.    Governing Law.  This Agreement shall be governed by and construed in accordance with the State of Florida without regard to the conflicts of law rules of such state.

20.7.    Counterparts; Third Party Beneficiaries.  This Agreement may be signed in one or

- 11 -

more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same Agreement. No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

20.8. Entire Agreement. This Agreement (including all schedules, exhibits and other documents contemplated by this Agreement, all of which are hereby incorporated by reference) constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement. This Agreement supersedes all previous agreements between the parties for the sale of the assets set forth herein.

20.9. Severability. If any provision (or any portion thereof) of this Agreement shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement shall not be affected thereby.

20.10 Notice. All demands, notices, requests, and other communications hereunder shall be in writing and shall be deemed to have been duly given and received: (i) if mailed, addressed as set forth herein, on the date that the same is deposited in the United States registered or certified mail, return receipt requested, postage prepaid, or; (ii) if by facsimile or hand delivery, addressed as set forth herein, on the date delivered to or received at the premises of the other party. All notices hereunder shall be addressed as indicated below, or as otherwise specified by the parties hereto by notifying each other of the same in writing from time to time:

(a) to the Sellers: Morgan Marine Service, LLC c/o Morgan Huntley, One Washington Street, Newport, Rhode Island 02840 with a copy to David J. Fox, Esq. 850 Aquidneck Avenue, Middletown, Rhode Island 02842.

(b) to the Buyer: *ALL CRAFT MARINE* with a copy, not itself Notice, to P. Christopher Wegner     *40047 COUNTY RD 54 EAST, ZEPHYRHILLS, FL 33540* Wegner Law PLLC 3200 Bailey Lane Suite 199 Naples, FL 34105

IN WITNESS WHEREOF, the parties have hereunto set their hands this _22_ day of _March_, 2020.

SELLER:                                          BUYER:

Morgan Marine Service, LLC

By: _____                      _____
    Morgan Huntley, Authorized Member            ALL CRAFT MARINE, LLC
                                                 CEO

- 12 -

# Exhibit A

Excluded assets:

All Morgan Marine Bank accounts

Morgan Marine Accounts Receivable

Vanquish 23 CC MMFBCC235920

Vanquish 26 DC  MMPDC020**** (Harbor side marine)

Exhibit B

## AGREEMENT

This Agreement is hereby entered into on the 29ᵗʰ day of April 2016 by and between Morgan Marine Service, LLC ("Morgan Marine") and Bristol Harbor Boats, Inc. ("Bristol Harbor").

WHEREAS: Morgan Marine is a boat manufacturer seeking to acquire rights to designs  and molds to manufacture vessels within its line of "Vanquish Boats."

WHEREAS: Bristol Harbor is the owner of certain designs for three vessels now known as the "Bristol Harbor 19CC," "Bristol Harbor 21CC," and "Bristol Harbor 22A" (collectively referred to as the "Bristol Harbor Designs") and the tooling and molds  (identified in Exhibit "A" attached hereto) for the Bristol Harbor Designs.

WHEREAS:  Morgan Marine and Bristol Harbor desire to enter into an agreement to  grant Morgan Marine the exclusive right to build the Bristol Harbor Designs, which will be  rebranded as models within Morgan Marine's line of "Vanquish Boats."

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and adequacy all of which are hereby acknowledged, the parties hereto agree as follows:

### I.   OWNERSHIP:

Bristol Harbor warrants that it is the owner of the Bristol Harbor Designs, and the tooling and molds identified in Exhibit "A" attached hereto.

### II.   EXCLUSIVITY:

Bristol Harbor grants to Morgan Marine the exclusive use of the Bristol Harbor Designs and tooling and molds listed in Exhibit "A", as well as any replacement molds hereinafter constructed, for an unlimited time and for an unlimited number of boats and Morgan Marine shall be entitled to rebrand the Bristol Harbor Designs as models within its line of "Vanquish Boats," or any  other name it so chooses in Morgan Marine's sole discretion.

### III.   HULL IDENTIFICATION:

Within each of the three Bristol Harbor Designs, Morgan Marine shall identify the hulls in numerical order beginning with "1."

### IV.   ROYALTIES.

Morgan Marine agrees to pay Bristol Harbor royalties on the sale of vessels constructed using a Bristol Harbor Design according to the following schedule:

1

A. Fee Schedule.
  i. No royalties shall be owed on the first three hulls built from Bristol Harbor Designs
  ii. Morgan Marine shall pay $500 per vessel sold starting with the fourth hull built from the Bristol Harbor Designs.

B. Payments. Payment of royalties shall be due and owing within 60 days after Morgan Marine has been paid, in full, for the vessel. Morgan Marine shall once a quarter furnish Bristol Harbor an accounting of the vessels sold.

V.  TOOLING & MOLDS:

A. Possession: Upon execution of this agreement Morgan Marine shall be entitled to take possession of the tooling and molds identified in Exhibit "A", which items shall be stored by Morgan Marine in a manner as is customary in the industry.

B. Condition: Both parties acknowledge that the tooling and molds identified in Exhibit "A" are in "used condition" and that the useful life of said items cannot be established with any certainty. Therefore, Bristol Harbor does not warrant the condition of these items and transfers the use of same to Morgan Marine in "as is" condition and Morgan Marine shall not be liable to Bristol Harbor for the condition of the tooling and molds while in the possession of, or use by, Morgan Marine.

C. Purchase by Morgan Marine. The purchase price for the tooling and molds identified in Exhibit "A" is $12,500.(the "purchase price"), From each hull built from Bristol Harbor Designs after the third hull, Morgan Marine shall pay Bristol Harbor $250 per vessel for the use of the tooling and molds until the purchase price is paid in full, at which time title to the tooling and molds shall pass to Morgan Marine. Payment shall be made at the time of royalty payments due. At its option, Morgan may prepay the purchase price at any time.

VI.  INDEMNIFICATION.

A. To the fullest extent permitted by law, Bristol Harbor hereby agrees to defend, indemnify and hold harmless Morgan Marine, and their agents, servants and employees, from and against any and all claims, damages, losses, costs and expenses of any kind, including but not limited to attorney's fees, incurred by reason of any liability for damage because of bodily injuries, including death resulting from such injuries, and/or property damage to real and personal property of any kind whatsoever, sustained by any person or persons, caused by, resulting from, arising out of or occurring in connection with all boats manufactured prior to the date of this Agreement by Bristol Harbor, or any of its agents, licensees, servants etc., from the tooling and molds mentioned herein and/or from the Bristol Harbor Designs.

Bristol Harbor further agrees to defend, indemnify and hold harmless Morgan Marine, and their agents, servants and employees, from and against any and all claims arising

2

out of Morgan Marine's right to use the tooling and molds identified herein, including any infringement claims related to any intellectual or other property right.

B. Morgan Marine hereby agrees to indemnify, defend, and hold harmless Bristol Boats, and their agents, servants and employees from and against any and all claims, damages, losses, costs and expenses, of any kind, including but not limited to attorney's fees incurred by reason of any liability for damages because of bodily injury, including death resulting from or _____ and or property damage to real and personal property of any kind whatsoever, sustained by any person or persons caused by, resulting from, arising out of or occurring in connection with the manufacturing of vessels by Morgan Marine from the tooling and molds described in Exhibit "A", and any replacement tooling and molds.

## VII.  ASSIGNMENT/TRANSFER

Morgan Marine may not sell, transfer, or assign any rights under this agreement without the prior written consent of Bristol Harbor which consent shall not be unreasonably withheld. Any permitted purchaser, assignee or transferee shall become obligated under all the terms of this Agreement, including payment of royalties and upon such sale, transfer or assignment all future obligations of Morgan Marine shall cease.

## VIII.  TERMINATION OF THE AGREEMENT

A. Termination of Agreement upon Default. If either party fails to cure any default under this agreement within 30 days of written notice of said default, then the non-defaulting party may terminate this agreement, which said termination shall be in writing.

B. Voluntary Termination of Agreement. Morgan Marine may terminate this agreement, in its sole discretion, by providing thirty (30) days written notice of such termination.

C. Upon termination the permission given to Morgan Marine to use the Bristol Harbor Designs, and the tooling and molds listed in Exhibit "A" shall cease. If not purchased then the Bristol Harbor Designs, mold and tooling shall be returned to Bristol Harbor, and if purchased, their use by Morgan Marine shall cease.

## IX.  MISCELLANEOUS PROVISIONS

A. Notices: All notices required by this Agreement shall be sent to the following:

    Morgan Marine Service 1
    Washington Street
    Newport, Rhode Island 02840

    Copy to:    David J. ____, Esq.

3

850 Aquidneck Avenue Middletown,
Rhode Island 02842

Bristol Harbor Boats, Inc.
99 Poppasquash Road -- Unit H
Bristol, RI 02809

B. Entire Agreement: This Agreement supersedes all prior negotiations and
agreements between the parties and sets forth the entire understanding of the
parties. There are no agreements, representations, warranties, covenants or
conditions, either precedent or subsequent, unless herein specifically contained.

C. Non-Waiver. The failure of any party to exercise any power reserved to it under
the Agreement, or the failure by either party to insist upon the strict compliance by
the other party with any term, covenant, or condition of the Agreement, shall not
be deemed to be a waiver of any such term, covenant, or condition.

D. Successors and Assigns: All the terms and provisions of this Agreement shall be
binding upon the parties' respective heirs, executors, administrators, and permitted
successors and assigns.

E. Counterparts. This Agreement may be executed in two counterparts, each of which
shall be deemed an original.

F. Independent Contractors: It is understood that both parties hereto are independent
contractors engaged in the operation of their own respective businesses and no
party hereto is considered the agent of the other party, for any purpose whatsoever,
and no party has any authority to enter into any contracts or assume any obligations
for the other party to make any warranties or representations on behalf of the other
party; and nothing in this Agreement shall be construed to establish a relationship
of partners or joint ventures between the two parties.

[Intentionally left blank]

4

G. Severability  The promises, representations, covenants and warranties contained in this Agreement are severable, and the unenforceability or invalidity of any such promise, representations, covenants and warranties shall not affect the remaining promises, representations, covenants and warranties herein contained.

WITNESS                                    MORGAN MARINE SERVICE, LLC

_____                    By: _____
LEANNE E. F. HUNTLEY                           Morgan Huntley – Authorized Signatory
Print Name


WITNESS:                                   BRISTOL HARBOR BOATS, INC.:

Hope Burchard                              By: _____
Hope Burchard                                  Gregory W. Beene – President
Print Name

5

Exhibit "A"

## 1.01a - Bristol Harbor Boats Molds/Tooling

1. 21' hull mold
2. Structural grid mold
3. 21' liner mold
4. 21' deck ring mold
5. 21CC center console mold
6. 21CC pan mold
7. Scupper mold
8. Miscellaneous seat hatch molds
9. 19CC center console mold
10. 19' hull blockout (for use with 21' hull mold)
11. 19CC aft seat mold
12. 22A deck ring mold (for 21' hull)
13. 22A windshield mullion mold (for 21' hull)

## Employment Agreement

This EMPLOYMENT AGREEMENT (the "**Agreement**") is made and entered into as of March 23, 2020 (the "Effective Date") by and between **MORGAN HUNTLEY** (the "Employee") and **ALL CRAFT MARINE**, a Florida limited liability company (the "Company").

WHEREAS, the Company desires to employ the Employee on the terms and conditions set forth herein; and

WHEREAS, the Employee desires to be employed by the Company on such terms and conditions;

NOW, THEREFORE, in consideration of the mutual covenants, promises, and obligations set forth herein, the parties agree as follows:

1.     Term. The Employee's employment hereunder shall be effective as of the closing and funding of the All Craft Marine and Vanquish Boats Purchase Agreement or the Effective Date noted above, whichever is later, and, unless sooner terminated in accordance with the terms of this Agreement, shall end upon dissolution of the Company in accordance with the terms of the LLC Agreement.

2.     Position and Duties.

    2.1     Position. The Employee shall serve with the title Chief Operating Officer, reporting to the President and CEO of the Company or other designee of the Board of Managers. In such position, the Employee shall have the duties and responsibilities set forth in that certain Purchase Agreement (to which this Agreement was originally attached and is hereby incorporated by reference).

3.     Place of Performance. The Employee place of Employee's employment shall be in Newport, Rhode Island; provided that, the Employee may be required to travel on Company business during his employment.   The Employee will seek approval from their manager regarding place and schedule of work.

3.1     The first three months of employment from the Effective Date shall be spent at the Company's Headquarters in Zephyrhills, FL.

3.2     The second three months of employment the Employee shall spend two consecutive weeks a month at the Company's Headquarters in Zephyrhills, FL.

3.3     After six months of employment from the Effective Date, the Employee shall spend a minimum of one week a month at the Company's Headquarters in Zephyrhills, FL.

3.4     The Company will reimburse the Employee for place of employment expenses, including travel and lodging only, for the first three months of employment. After three months, the employee is responsible for all expenses associated with travel to place of employment. The Company will provide a $1,000 place of employment "Stipend" payment to cover such cost.

Compensation.

3.5     Salary. The Company shall pay the Employee a salary of $88,000 per year (the "Salary"), in periodic installments no less frequently than twice a month (subject in all events to applicable wage payment laws).

3.6     Performance Bonus Plan. From time to time the Company may issue Employee a bonus of up to twenty-five percent of Employee's Salary per calendar year ("Performance Bonus"). The Company will grant this Performance Bonus to Employee if, and to the extent, Employee meets criteria agreed to by the CEO and Board of Managers, at their exclusive discretion. The bonus target will be based upon 80% specific objectives for the company (i.e. revenue, cash, EBITDA) and 20% will be driven by your accomplishments on specific personal objectives (i.e. manufacturing cost, schedule, quality, etc.). The majority of your bonus will be tied to how the management team does meeting company level objectives (all in the "boat" together, relying on each other's success, helping each other succeed).

3.7     Management Incentive Equity Plan. In addition to any equity Employee receives from any other source, Employee will be eligible for a Management Incentive Equity award in the Company representing 1 to 2 % of all outstanding equity interests. The plan will be developed by and awards will be determined by the CEO and Board of Managers, at their

exclusive discretion. This equity interested shall be Restricted, within the meaning set forth in Section 83 of the Internal Revenue Code and related regulations. Management Incentive Equity shall be subject to the provisions identified below:

The Management Incentive Equity award will vest over a four (4) year period beginning with the Effective Date of this Agreement and ending on the fourth anniversary thereof. During this period, twenty-five percent of the award, as determined at the time of this Agreement, shall vest each anniversary of Effective Date.

3.7.1   Repurchase of Equity upon Termination. Upon termination of this Agreement, Company shall have the rights to buy back all interests in Company owned by or awarded to Employee, regardless of source, in accordance with the terms and times described below:

1.   Terminated by Company for Cause

   a.   Company may buy back at our "marked to market" value or original value as identified in that certain Purchase Agreement, at the discretion of the Company.

   b.   Purchase price will be paid in full no later than one (1) year following the Company's election to purchase the interest

   c.   Employee loses all rights to vote upon termination.

2.   Terminated by Company without Cause

   a.   Company has the option to buy back at "marked to market" value applying reasonable market discounts for minority ownership and lack of marketability, but no more than a 40% discount.

   b.   Purchase price will be paid in full no later than one (1) year following the Company's election to purchase the interest

   c.   Employee loses all rights to vote upon termination.

3.   Termination by Employee without Cause

    a.    Company has the option to buy back at "marked to market" value applying reasonable market discounts for minority ownership and lack of marketability, but no more than a 40% discount.

    b.    Purchase price will be paid in full no later than one (1) year following the Company's election to purchase the interest

    c.    Employee loses all rights to vote upon termination.

3.8    Employee Benefits. To the extent that the Company awards benefits to the Employee's class of employees, Employee shall receive the same or comparable benefits.

3.9    Vacation; Sick Days. The Employee shall receive 15 days of paid time-off (PTO) in accordance with the Company's policies for employees as such policies may exist from time to time. Unused vacation and sick days cannot be carried over and will not be paid out upon separation of employment.

3.10    Business Expenses. The Employee shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by the Employee in connection with the performance of the Employee's duties hereunder. Any such expenses must be approved in advance by Board of Managers or consistent with the Budget then in effect.

4.    Termination of Employment. The Employee's employment hereunder may be terminated by either the Company or the Employee at any time and for any reason; provided that, unless otherwise provided herein, either party shall be required to give the other party at least 30 days advance written notice of any termination of the Employee's employment. Upon termination of the Employee's employment, the Employee shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates except as set forth in other agreements between the Parties:

4.1    Notwithstanding the foregoing:

ORLDOCS 17301/95 1

4

(a)    The Employee's employment hereunder may be terminated immediately by the Company for Cause.  If Employee's employment is terminated, the Employee shall be entitled to receive:

(i)    any accrued but unpaid Salary (through the Termination Date) which shall be paid on the pay date immediately following the Termination Date (as defined below) in accordance with the Company's customary payroll procedures;

(ii)    reimbursement for unreimbursed and approved business expenses properly incurred by the Employee prior to Termination Date; and

(iii)    such employee benefits, if any, to which the Employee may be entitled under the Company's employee benefit plans as of the Termination Date (if any); provided that, in no event shall the Employee be entitled to any payments in the nature of severance or termination payments except as specifically provided herein.

(b)    For purposes of this Agreement, "Cause" shall mean:

(i)    the Employee's failure to perform his duties (other than any such failure resulting from incapacity due to physical or mental illness);

(ii)    the Employee's failure to comply with any valid and legal directive of the Board of Managers;

(iii)    the Employee's engagement in dishonesty, illegal conduct, or misconduct, which is, in each case, injurious to the Company or its affiliates;

(iv)    the Employee's embezzlement, misappropriation, or fraud, whether or not related to the Employee's employment with the Company;

(v)    the Employee's conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent) or a crime that constitutes a misdemeanor involving moral turpitude;

(vi)    the Employee's violation of a material policy of the Company;

(vii)   the Employee's willful unauthorized disclosure of Confidential Information (as defined below);

(viii)   the Employee's material breach of any material obligation under this Agreement or any other written agreement between the Employee and the Company;

(ix)   the Initial Member's material breach of any material obligation under the LLC Agreement or any other written agreement between the Initial Member and the Company or the Investment Member; or

(x)   any material failure by the Employee to comply with the Company's written policies or rules, as they may be in effect from time to time.

4.2   Death.

(a)   The Company may terminate the Employee's employment on account of the Employee's death.

(b)   If the Employee's employment is terminated on account of the Employee's death, the Employee's estate and/or beneficiaries, as the case may be, shall be entitled to receive the Accrued Amounts.

Notwithstanding any other provision contained herein, all payments made in connection with the Employee's death shall be construed in a manner which is consistent with federal and state law.

4.3   Notice of Termination. Any termination of the Employee's employment hereunder by the Company or by the Employee shall be communicated by written notice of termination ("Notice of Termination") to the other party hereto in accordance with Section 24. The Notice of Termination shall specify:

(a)   The termination provision of this Agreement relied upon;

(b)   To the extent applicable, the facts and circumstances claimed to provide a basis for termination of the Employee's employment under the provision so indicated; and

6

(c)   The applicable Termination Date.

4.4   Termination Date. The Employee's "Termination Date" shall be:

(a)   If the Employee's employment hereunder is terminated on account of the Employee's death, the date of death;

(b)   If the Company terminates the Employee's employment hereunder for Cause, the date the Notice of Termination is delivered to the Employee;

(c)   If the Company terminates the Employee's employment hereunder without Cause, the date specified in the Notice of Termination, and the Employee shall continue to receive his Salary hereunder; and

(d)   If the Employee terminates his employment hereunder, the date specified in the Employee's Notice of Termination, which shall be no less than 30 days following the date on which the Notice of Termination is delivered, and the Employee shall receive the Accrued Amounts in the method and as provided for in Section 6.3(1)(a) above.

4.5   Resignation of All Other Positions. Upon termination of the Employee's employment hereunder for any reason, the Employee shall be deemed to have resigned from all positions, if any, that the Employee holds as an officer or member of the Company or any of its affiliates.

4.6   Severance. In the event Company terminates Employee without cause, as such is described herein, in addition to other amounts provided herein, Employee will receive a "Severance" in the form of payments totaling one half of Employee's then current salary and paid by the Company according to one of the following, at the Company's discretion:

One (1) lumpsum payment no more than thirty (30) after the effective date of the termination; or

Payable in installments over the six month period following the effective date of termination as if Employee were still receiving the amount s as an employee of the Company; or

. A combination of the methods provided above.

For purposes of clarification, regardless of repayment method, Employee is solely responsible

for paying taxes and other amounts to any government agency as required by law; however, Company may also withhold any amounts that the Company may be required by law to collect or remit. Severance payments are based solely on the Employee's monetary base salary and not any other benefits or non-cash compensation.

5.    Confidentiality.   Company and Employee each agree, as an inducement to the performance by Company of its obligations under this Agreement and in consideration of the Purchase Price, that none of Company or any of the Employee shall use, permit the use of, disclose, or permit the disclosure to any competitor or other third party of any Confidential Information (as herein defined).  Company and each of the Employee acknowledge that the continued success of Company is highly dependent upon maintaining the confidentiality of such information and preventing its disclosure to competitors and other third parties.  "Confidential Information" includes, but shall not be limited to, information pertaining to research and development of new product designs, sales and marketing information of Company, trade secrets, software programs, and customer data and shall include any information of a similar nature hereafter identified to this Agreement as confidential or proprietary.  "Customer data" means any information pertaining to a customer, distributor, supplier, or other person or entity contacted to utilize Company's services or purchase or license its products, including, but not limited to, preferences, pricing information, service needs, software, and similar insider knowledge of such parties' requirements obtained by Company at any time or obtained by Company or any Employee.  Company and each Employee each agree that for the period twenty-four (24) months following the Closing Date (the "Restricted Period"), neither Company nor any Employee will disclose to any unauthorized person or use for its own account, any of such Confidential Information, unless and to the extent the aforementioned matters become known to or available for use by the public otherwise than as a result of Company's or such Employee's acts or omissions to act.  Company and Employee each further agree that after the Closing Date, he will not withhold or retain any records, papers, letters, or other data and information with respect to the Assets or Confidential Information.

6.    Noncompetition and Non-solicitation.   At all times during the Restricted Period, Company and each Employee (as to himself or itself) agree that, it or he will not directly or indirectly, individually or jointly with others, whether for it or his own account or the account of

ORLDOCS 17308035 1

8

any other person or entity solicit, divert, attempt to take away or interfere with any customer, client, or distributor of Company, or cause any of them to reduce the extent of, or otherwise adversely affect such entity's business relationship with Company, nor own, manage, operate, control, be employed by, participate in, assist others in, have an interest in, or otherwise engage in, or permit it or his name to be used by or in connection with, in any capacity, including as a partner, shareholder, member, employee, Employee, agent, trustee or consultant, any business engaged in the Business or that otherwise competes with Company in the Business or in the business of powerboat and yacht product design, manufacturing and sale within the Restricted Territory; provided, however, that the record or beneficial ownership by any Employee of one percent (1%) or less of the outstanding publicly traded capital stock of any company for investment purposes shall not be deemed to be in violation of this Section so long as the Employee is not an officer, director, employee or consultant of such Person. Company and each Employee (as to himself) further covenants that it or he will not solicit, hire or employ, in any capacity, any employee or independent contractor of Company or former employee or contractor who had been employed by or engaged as an independent contractor Company or Company within the twelve (12) months preceding the date of such solicitation or other action; provided, however, that in the event that Company relocates the Business and solely as a result thereof, any employee or contractor of the Company terminates his employment with Company, Company will not unreasonably withhold its consent to such employee's or contractor's request to work for an Affiliate of the Employee.

For purposes of this Agreement, the "Restricted Territory" means within any market in the United States of America.

7.     Noninterference.  At all times during the Restricted Period, Company and each Employee (as to himself) agrees that, it or he will not directly or indirectly, (I) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Closing Date) between the Company and/or Company and customers or suppliers of Company and/or Company or (ii) to refrain from all conduct, verbal or otherwise, that disparages or damages or is intended to damage the reputation, goodwill, or standing in the community of the Company.

8.    Governing Law; Jurisdiction and Venue. This Agreement, for all purposes, shall be construed in accordance with the laws of Florida without regard to conflicts of law principles.

9.    Entire Agreement. Unless specifically provided herein, this Agreement contains all of the understandings and representations between the Employee and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

10.    Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Employee and by the Company. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

11.    Severability. Should any provision of this Agreement be held by a court of competent jurisdiction or arbitral forum, as applicable, to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties expressly agree that this Agreement as so modified by the court or arbitral forum, as applicable, shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

12.    Captions. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

13.    Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

14.    Successors and Assigns. This Agreement is personal to the Employee and shall not be assigned by the Employee. Any purported assignment by the Employee shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

15.    Notice. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

If to the Company:

*ALL CRAFT MARINE, LLC*
*40047 COUNTY RD 54 EAST*
*ZEPHYRHILLS, FL 33540*

If to the Employee:

Morgan Marine Service, LLC c/o Morgan Huntley, One Washington Street, Newport, Rhode Island 02840 with a copy to David J. Fox, Esq. 850 Aquidneck Avenue, Middletown, Rhode Island 02842,

MH 3/22/20 6:52 PM
Deleted:
MH 3/22/20 6:53 PM
Deleted:

16.    Representations of the Employee. The Employee represents and warrants to the Company that:

The Employee's acceptance of employment with the Company and the performance of his duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which he is a party or is otherwise bound.

The Employee's acceptance of employment with the Company and the performance of his duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

17.    Withholding. The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

18.    Survival. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

19.    Acknowledgement of Full Understanding. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT HE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF HIS CHOICE BEFORE SIGNING THIS AGREEMENT.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

I ALL CRAFT MARINE, LLC

By _____

Name:_____ LLOYD R. SORENSON

Title:_____ CEO

MORGAN HUNTLEY

Signature: _____

Print Name: Morgan Huntley

2:12 PM
3:15:20

# Morgan Marine Services LLC
## A/R Aging Summary
### As of March 18, 2020

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Diaz Marine | 0.00 | 113,047.00 | 0.00 | 0.00 | 0.00 | 113,047.00 |
| Maria Cassidy | 0.00 | 3,172.50 | 0.00 | 0.00 | 0.00 | 3,172.50 |
| TOTAL | 0.00 | 116,219.50 | 0.00 | 0.00 | 0.00 | 116,219.50 |

Page

SCHEDULE "C"



Vanquish Boats   |   1 Washington St.   |   Newport Shipyard   |   Newport, RI 02840   |   401-847-1610

Assets list

Build books
CAD
-21 CC
-23 CC
Hand written
24 RA
26 DC
24 CC

BOM
21 CC
23 CC
23 CD
24 RA
24 CC
26 DC
26 RA
26 CC

Laminate schedules
Construction drawings
Wire diagrams
Jigs & patterns
Marketing materials:
All existing brochures ( approximately 1000),  Photos, signs, Banners, digital media not
owned by a 3rd party.
1135 Vanquish leads Name Email Phone Numbers.


Exhibit A

PAGE 1

Excel list all Molds

PAGE 2

21 & 23

# Vanquish
## Bristol Harbor 23 CC & Cuddy
### Mold FRP Part List

| Item # | Description | 21 Center | 23 Center | 23 Cuddy |
|---|---|---|---|---|
| 1 | Hull – CC/Cuddy | 1 | 1 | 1 |
| 2 | Grid – CC/Cudy | 1 | 1 | 1 |
| 3 | Main Deck – CC | 1 | 1 | N/A |
| 4 | Deck Ring – CC | 1 | 1 | N/A |
| 5 | Main Deck – Cuddy | N/A | N/A | 1 |
| 6 | Deck Ring – Cuddy | N/A | N/A | 1 |
| 7 | Console – CC | 1 | 1 | N/A |
| 8 | Deck Hatches Small (4 ea.) | 4 | 4 | 2 |
| 9 | Deck Hatch Medium (1 ea.) | 1 | 1 | 2 |
| 10 | Head Pan – CC | 1 | 1 | N/A |
| 11 | Transom Step Filler – CC/Cuddy | N/A | 1 | 1 |
| 12 | Helm Seat – CC | N/A | 1 | N/A |
| 13 | Livewell Tub (Babby Blue) – CC | N/A | 1 | N/A |
| 14 | Livewell Housing – CC | N/A | 1 | N/A |
| 15 | Helm Pod – Cuddy | N/A | N/A | 1 |
| 16 | Deck Hatch Large (1 ea.) | N/A | N/A | 1 |
| 17 | Windshield – Cuddy | N/A | N/A | 1 |
| 18 | Table – CC | Option | Option | N/A |

Note:   Check Production order for Colors
       & for Options



$PAGE\ 3$

24 & 26

# Vanquish
## 24 & 26
## Mold FRP Part List

| Item # | Description | 24 RB | 24 CC | 26 CC | 26RB | 26 DC |
|---|---|---|---|---|---|---|
| 1 | Hull | 1 | 1 | 1 | 1 | 1 |
| 2 | Grid | 1 | 1 | 1 | 1 | 1 |
| 3 | Main Deck 24/26 | 1 | 1 | 1 | 1 | N/A |
| 4 | DC Main Deck | N/A | N/A | N/A | N/A | 1 |
| 5 | 24/26 Console | N/A | 1 | 1 | N/A | N/A |
| 6 | DC Head Pan | N/A | N/A | N/A | N/A | 1 |
| 7 | 26 Head Pan | N/A | N/A | 1 | N/A | N/A |
| 8 | DC Head Liner | N/A | N/A | N/A | N/A | 1 |
| 9 | DC Transom Door | N/A | N/A | N/A | N/A | 1 |
| 10 | DC Helm Pod | N/A | N/A | N/A | N/A | 1 |
| 11 | DC Head Door | N/A | N/A | N/A | N/A | 1 |
| 12 | Helm Seat (Used On Bristol Harbor) | N/A | N/A | 1 | N/A | N/A |
| 13 | DC Helm Storage Box Port | N/A | N/A | N/A | N/A | 1 |
| 14 | DC Helm Storage Box Stb | N/A | N/A | N/A | N/A | 1 |
| 15 | Swim Platform (Inboard) | 1 | 1 | N/A | N/A | N/A |
| 16 | Swim Platform (Outboard) | N/A | N/A | 1 | 1 | 1 |
| 17 | Bucket 26 | N/A | N/A | 1 | 1 | 1 |
| 18 | DC Forward Storage Side Box Port | N/A | N/A | N/A | N/A | 1 |
| 19 | DC Forward Storage Side Box Stb | N/A | N/A | N/A | N/A | 1 |
| 20 | DC Forward Bin Box Port | N/A | N/A | N/A | N/A | 1 |
| 21 | DC Forward Bin Box Stb | N/A | N/A | N/A | N/A | 1 |
| 22 | DC Aft Bin Box (Small) | N/A | N/A | N/A | N/A | 2 |
| 23 | DC Aft Bin Box (Large) | N/A | N/A | N/A | N/A | 1 |
| 24 | DC Anchor Deck Hatch | N/A | N/A | N/A | N/A | 1 |
| 25 | DC Deck Hatch (Large) | N/A | N/A | N/A | N/A | 1 |
| 26 | DC Deck Hatch (Medium) | N/A | N/A | N/A | N/A | 2 |
| 27 | 24 Anchor Deck Hatch | 1 | 1 | 1 | 1 | N/A |
| 28 | 24 Deck Hatch (Large) | 1 | 1 | 1 | 1 | N/A |
| 29 | 24 Deck Hatch (Medium) | 1 | 1 | 1 | 1 | N/A |
| 30 | Aft Bench Seat | 1 | 1 | N/A | 1 | N/A |
| 31 | Custom Engine Box w/Sink | N/A | N/A | N/A | 1 | N/A |

PAGE 4

| | | 24 & 26 | | | | |
|---|---|---|---|---|---|---|
| 32 | Engine Box | 1 | N/A | N/A | N/A | N/A |
| 33 | Engine Box Lid | 1 | N/A | N/A | 1 | N/A |
| 34 | Engine Box Pan | 1 | N/A | N/A | 1 | N/A |
| 35 | 26 Head Pan | N/A | N/A | 1 | N/A | N/A |
| 36 | Fwd Sette | N/A | 1 | N/A | N/A | N/A |
| 37 | Fwd Sette Fillers | N/A | 2 | N/A | N/A | N/A |
| 38 | Dash | 1 | N/A | N/A | 1 | N/A |
| 39 | Glove Box Lid | 1 | N/A | N/A | 1 | N/A |
| 40 | Premium Port Sette (Option) | 1 | N/A | N/A | 1 | N/A |
| 41 | Long Side Storage Box (Option) | 1 | 1 | 1 | 1 | 1 |
| 41 | Deck boss for Console | N/A | 1 | 1 | N/A | N/A |
| 42 | 26 DC/CC Hard top | N/A | N/A | 1 | 1 | 1 |

Note:   Check Production order for Colors
        & Options

Page 2

PAGE 5